UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                 )
                                 )
CMTA, INC.,                      )
                                 )
          Plaintiff              )
                                 )
     v.                          )
                                 )      Case No. 25-cv-10490-DJC
                                 )
JOSEPH DUSSAULT, BRIAN MULKERRIN, )
DMC CONSULTING ENGINEERS, LLC,   )
E3I ENGINEERS, INC., and         )
RYAN CENTER,                     )
                                 )
          Defendants.            )
                                 )
_____)
```

## MEMORANDUM AND ORDER

CASPER, C.J.                                          February 5, 2026

## I.    Introduction

Plaintiff and Counterclaim Defendant CMTA, Inc. ("CMTA") has filed this lawsuit against Defendants Joseph Dussault ("Dussault"), Brian Mulkerrin ("Mulkerrin"), Ryan Center ("Center"), e3i Engineers, Inc. ("e3i") and DMC Consulting Engineers, LLC ("DMC," and collectively, "Defendants") asserting claims for tortious interference with prospective economic advantage (Count III), unjust enrichment (Count V), civil conspiracy (Count VIII) and violations of Mass. Gen. L. c. 93A ("Chapter 93A") (Count VI) against all Defendants; aiding and abetting breach of fiduciary duty (Count VII) against Mulkerrin, Center, DMC and e3i; tortious interference with contractual relations (Count II) against Dussault and DMC; and breach of fiduciary duty (Count I) and fraudulent misrepresentation (Count IV) against Dussault. D. 27. DMC has asserted counterclaims against CMTA for tortious interference (Counterclaim Counts I and II). D. 33. E3i

1

has filed a crossclaim against Mulkerrin and Center for breach of fiduciary duty (Crossclaim Count I). D. 32. Dussault has moved to dismiss Count VI of the amended complaint. D. 31. Center has moved to dismiss all claims against him (Counts III and V through VIII). D. 47. CMTA has moved to dismiss the counterclaims. D. 41. For the reasons stated below, the Court DENIES Dussault's partial motion to dismiss the amended complaint, D. 31, ALLOWS Center's motion to dismiss the amended complaint, D. 47, and ALLOWS CMTA's motion to dismiss the counterclaims, D. 41.

## II.    Standard of Review

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must determine if the facts alleged "plausibly narrate a claim for relief." Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012). Reading the complaint "as a whole," the Court conducts a two-step, context-specific inquiry. García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013). First, the Court must perform a close reading of the complaint to distinguish the factual allegations from the conclusory legal allegations contained therein. Id. Factual allegations must be accepted as true, while legal conclusions are not entitled credit. Id. Second, the Court must determine whether the factual allegations support a "reasonable inference that the defendant is liable for the misconduct alleged." Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011) (citation omitted).

In sum, the complaint must provide sufficient factual allegations for the Court to find the claim "plausible on its face." García-Catalán, 734 F.3d at 103 (citation omitted). "To avoid dismissal, a complaint must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" Id. at 102 (quoting Fed. R. Civ. P. 8(a)(2)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S.

544, 555 (2007)).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  Id. (alteration in original) (quoting Twombly, 550 U.S. at 557).  "In determining whether a [pleading] crosses the plausibility threshold, 'the reviewing court [must] draw on its judicial experience and common sense.'"  García-Catalán, 734 F.3d at 103 (second alteration in original) (quoting Iqbal, 556 U.S. at 679).

## III.    Factual Background

The Court draws the following facts from the relevant pleadings, and it accepts the well-pleaded factual allegations as true for purposes of resolving the motions to dismiss.

### A.    CMTA's Amended Complaint

#### 1.    The Parties

CMTA provides engineering services to clients.  D. 27 ¶ 6.  Between approximately October 21, 2020, and January 17, 2025, Dussault was a partner and co-manager of CMTA's office in Framingham, Massachusetts.  Id. ¶¶ 7, 16, 28.

E3i and DMC also provide engineering services to clients.  Id. ¶¶ 9, 11.  Mulkerrin and Center are former e3i employees.  Id. ¶¶ 8, 10.  On or around January 28, 2025, e3i publicly announced that it had split into two companies, e3i and DMC, and that DMC would move forward under Mulkerrin's leadership.  Id. ¶ 45.  Mulkerrin formed DMC, a limited liability company, in August 2024.  Id. ¶¶ 11, 44.  As alleged, Dussault, Mulkerrin and Center are employees and members of DMC, and Mulkerrin is its managing member.  Id. ¶ 11.

#### 2.    Dussault's Employment with CMTA

CMTA provided confidential and client information to Dussault, one of its executives, including pricing, contract and certain financial information, to enable him to perform his job duties.  See id. ¶¶ 18-19.  CMTA also granted Dussault access to other resources, including engineering software programs AutoCAD and Revit, for which CMTA paid to obtain licenses.  Id.

3

¶¶ 20-21.  Around the time that he began his employment with CMTA, Dussault acknowledged receiving CMTA's employee handbook and acknowledged his obligation to comply with handbook policies, including policies on confidentiality.  See id. ¶¶ 23-24.  The handbook also included, *inter alia*, policies restricting employees' ability to engage in outside work.  See id. ¶ 23. On or around September 15, 2024, CMTA and Dussault agreed that Dussault's employment would end upon completion of his outstanding projects and receipt of his 2024 bonuses.  Id. ¶ 27.

### 3.  Dussault's Outside Work

After Dussault's separation from CMTA in January 2025, CMTA allegedly discovered that Dussault had, during his employment, provided services within the scope of his employment on his own behalf or through other business entities.  See id. ¶¶ 28-30.  CMTA had not authorized Dussault to engage in this outside work, and Dussault allegedly performed services using CMTA resources but concealed the outside work, including by saving relevant files on external storage media and failing to inform CMTA of the relevant business opportunities.  Id. ¶¶ 31-34.  CMTA was not paid for Dussault's outside work, and it alleges, upon information and belief, that Dussault or DMC has instead received that revenue.  Id. ¶¶ 35-36.

As alleged, Dussault's outside projects included work through a sole proprietorship, JD Engineering and Consulting ("JDE"), id. ¶ 37, work submitted using CMTA letterhead or logos or taken from CMTA after Dussault's departure, see, e.g., id. ¶¶ 49, 67, and work on behalf of DMC, id. ¶ 59.  Dussault also saved other CMTA materials on external hard drives, including CMTA templates and various documents relating to CMTA projects with which Dussault was not involved.  Id. ¶ 144.

### a)  JDE

On at least two occasions, Dussault used his CMTA laptop to access materials related to JDE on an external hard drive.  Id. ¶¶ 40-41.  Additionally, in March 2023, Beth Israel Lahey

4

Health ("BILH") submitted a purchase order to JDE for $150,000 in engineering services, which listed Dussault's home address as the address for JDE.  Id. ¶ 38.  In June 2023, JDE received $30,000 from BILH for engineering services.  Id. ¶ 39.

        b)      CMTA Materials and Work

On or around May 20, 2024, Dussault submitted proposals to CMTA client Harvard Business School ("HBS") for two projects relating to Shad Hall.  Id. ¶ 48.  The proposals included CMTA letterhead and logos.  Id. ¶ 49.  Dussault allegedly downloaded project files from CMTA's local network and saved them on an external hard drive.  Id. ¶¶ 50-54; see id. ¶ 55.  On approximately October 30, 2024, Dussault used CMTA letterhead to submit a proposal for additional services for one of these projects.  Id. ¶ 56.  The project proposals indicate that the fee for Dussault's services was approximately $57,850.  Id. ¶ 57.

On May 23, 2024, Dussault used his CMTA email address to log into a meeting for a project for Citizens Bank.  Id. ¶ 138.  Center attended this meting on behalf of e3i.  Id.  Dussault used his CMTA laptop to access and save on an external hard drive files apparently related to Citizens Bank, one of which had the file path, "E:\Citizens Bank\CONCORD\MARKUPS TO RYAN\M02.01 FOR REVIEW #2 – JD REVIEW.pdf."  Id. ¶ 139.  CMTA alleges, upon information and belief, that "Ryan" refers to Center.  Id. ¶ 140.  On January 10, 2025, Center emailed Dussault and Mulkerrin and stated that he was "in the middle of a ton of Citizens coordination."  Id. ¶ 141.  CMTA alleges, upon information and belief, that e3i, Center and Mulkerrin had a relationship with Citizens Bank and conspired with Dussault to provide services without CMTA's knowledge.  Id. ¶ 143.

On approximately July 29, 2024, e3i submitted a proposal to CMTA client BILH, which, unbeknownst to CMTA, listed that CMTA would provide roughly $90,000 in mechanical engineering services on the project.  Id. ¶¶ 85-86, 88.  Dussault used his CMTA laptop to access

related files stored on external hard drives.  Id. ¶ 87.  In October 2024, BILH emailed Dussault and a non-party e3i employee about a separate BILH project about which CMTA was unaware. Id. ¶¶ 89, 91.  After Dussault's departure, his CMTA email received a notice of overdue submissions for this project.  Id. ¶ 90.

In September 2024, Dussault and Center corresponded with an architectural firm regarding another BILH project.  Id. ¶¶ 99-100.  The same month, another (non-party) e3i employee submitted a drawing for this project that included e3i and CMTA logos, but CMTA was unaware of the project until after Dussault's departure.  Id. ¶¶ 101-04.

On approximately October 2, 2024, Harvard Law School approved a fee proposal submitted by an architectural firm, indicating that the firm would contract with CMTA for $293,700 in mechanical engineering services on a project.  Id. ¶¶ 74-75, 84.  On or around October 31, 2024, Dussault informed CMTA's business manager that the project would not move forward and instructed her to void a related invoice.  Id. ¶ 76; see id. ¶ 18.  This was allegedly false, and on approximately December 10, 2024, Dussault's CMTA email received a message regarding a meeting to discuss the same project the next day.  Id. ¶¶ 78-79.  Dussault later accessed materials for this project that he had prepared using CMTA resources and saved them to an external hard drive.  Id. ¶¶ 81-83.

On approximately November 20, 2024, Dussault submitted a proposal on CMTA letterhead to perform certain due diligence on a bottling plant in New Hampshire.  Id. ¶¶ 106-07.  Dussault and Mulkerrin attended meetings for this project, ostensibly on behalf of CMTA and DMC.  Id. ¶¶ 109-10.  On January 10, 2025, Mulkerrin used a DMC email to ask Dussault and Center to review a related project proposal.  Id. ¶ 111.

On February 19, 2025, Dussault's CMTA email received an invitation for a walkthrough for a HBS project for Wadsworth House.  See id. ¶ 66.  The architect for this project had subcontracted with CMTA for mechanical engineering services.  Id. ¶¶ 62-63.  As alleged, Dussault falsely informed CMTA before his departure that the construction-administration phase of the project was on hold.  Id. ¶¶ 64-65.  After Dussault's account received the walkthrough invitation, CMTA contacted a member of the architectural firm, who stated that Dussault had (apparently falsely) informed the firm that CMTA had given Dussault permission to continue work on the project after his departure.  Id. ¶¶ 67-68.  The same person later informed CMTA that Dussault had been working on the project since he left CMTA.  Id. ¶ 71.

c)    DMC

On approximately December 10, 2024, Dussault submitted a project proposal for a client for whom CMTA had done work in 2023 and early 2024.  Id. ¶¶ 115, 117.  Less than one week before submitting this proposal, Dussault had accessed files relating to CMTA's past work for this client.  Id. ¶ 115.  The proposal contained DMC logos and stated that DMC would work closely with Dussault.  Id. ¶ 118.  On or around January 8, 2025, the firm to which Dussault had submitted the proposal requested DMC's IRS Form W-9 from Mulkerrin.  Id. ¶ 120.  Dussault allegedly accessed files related to this project on an external hard drive connected to his CMTA laptop on January 14, 2025.  Id. ¶¶ 122-23.

Later in December 2024, Dussault allegedly submitted drawings containing DMC's logo to a real estate company.  Id. ¶¶ 125, 134.  In July 2024, Dussault, Mulkerrin and e3i had secured a contract to perform three projects for this company.  Id. ¶ 129.  CMTA alleges, upon information and belief, that Dussault and Mulkerrin had held themselves out as representatives of CMTA and e3i, respectively, but that e3i, Mulkerrin, DMC and Dussault conspired to pay Dussault rather than

CMTA for Dussault's services.  Id. ¶¶ 131, 133.  Dussault used his CMTA laptop to access files related to this project stored on an external hard drive.  Id. ¶ 135.

On approximately January 5, 2025, Dussault submitted drawings for two additional HBS projects, which contained DMC's logo.  Id. ¶ 59.  In December 2024, he had communicated with HBS regarding a check-in meeting for these projects.  Id. ¶ 58.  Dussault saved related files on an external hard drive connected to his CMTA laptop.  Id. ¶ 60.

On or around January 15, 2025, Dussault sent drawings containing the DMC logo to Beth Israel Deaconess Medical Center ("BIDMC") – Plymouth, which is within BILH.  Id. ¶ 94.  The contract for this project was drafted to fall under a CMTA contract with BIDMC.  Id.  Dussault also used his personal email account in connection with these drawings.  Id. ¶¶ 93, 95.  BIDMC sent related correspondence to Dussault's CMTA email on January 23, 2025.  Id. ¶ 96.

### B.    DMC's Amended Counterclaims

According to DMC, Mulkerrin formed DMC around August 7, 2024, in anticipation of e3i's reorganization, and it became operational in January 2025.  D. 33 ¶¶ 9-10.[1]  Mulkerrin, an electrical engineer, is the owner and one of six employees of DMC.  Id. ¶¶ 6, 8.  Dussault, a mechanical engineer who specializes in the healthcare industry, ended employment with CMTA on January 17, 2025, and became an employee of DMC on January 20, 2025.  Id. ¶¶ 12, 13, 16.  Mulkerrin and Dussault have worked together regularly, including while they were at e3i and CMTA, respectively.  Id. ¶ 14.  As one example, on projects for which e3i had a contract for electrical work, which Mulkerrin performed, CMTA was regularly the subcontractor for mechanical work, which Dussault performed.  Id. ¶ 15.

---

[1] The Court uses "¶" here in reference to the paragraphs of the counterclaims rather than DMC's and Mulkerrin's answer to the amended complaint.  See id. at 25-33.

BIDMC has been a regular client of Mulkerrin's since approximately 1998, before he worked at e3i.  Id. ¶ 11.  On or around January 31, 2025, BIDMC asked DMC to submit a proposal with qualifications for a MSA for certain mechanical, electrical and plumbing/fire protection services.  Id. ¶ 38.  DMC submitted a proposal and was informed that it would receive work from BIDMC as a result.  Id. ¶ 39.  DMC anticipated receiving up to approximately $500,000 to $1,000,000 annually under the BIDMC MSA.  Id. ¶ 42.  On or around March 3, 2025, DMC also agreed to do two design projects at Mount Auburn Hospital for BILH/BIDMC, with the expectation DMC would obtain approximately $368,500 in fees.  Id. ¶¶ 27-29.

As alleged by DMC, CMTA's original complaint "is rife with false allegations."  Id. ¶ 20.  CMTA's amended complaint includes an additional allegation related to BILH or BIDMC, which DMC alleges is also false.  Id. ¶¶ 25-26.  DMC alleges, upon information and belief, that CMTA relayed at least some of these false allegations to certain DMC clients referenced in the original complaint and "suggested that they stop working with DMC."  Id. ¶ 23.  This allegedly included a representative of Mount Auburn, who stated to CMTA that BILH/BIDMC did not want to be involved in the lawsuit.  Id. ¶¶ 30-31.  On March 18, 2025, BILH/BIDMC told DMC to put the Mount Auburn projects on hold.  Id. ¶ 33.  A BIDMC representative informed Dussault that the representative "had been made aware of the legal dispute and . . . had been directed to stop the [Mount Auburn] projects."  Id. ¶ 34.  The Mount Auburn representative informed Dussault "in substance" that BILH/BIDMC "loved working with Dussault but they did not want to get caught up in the allegations made by CMTA . . . so they would give the Mount Auburn . . . projects to CMTA instead."  Id. ¶ 35.  This person also stated, "in substance," that he would "call Jess back" to "let him know."  Id.  DMC alleges that "Jess" is CMTA employee Jess Farber.  Id. ¶ 36.  Dussault also spoke "with the BIDMC project manager, who stated they had been made aware of legal

action," after which BIDMC informed Dussault that "the projects" would go to CMTA.  Id. ¶¶ 40-41.  CMTA, instead of DMC, is now performing the Mount Auburn projects.  Id. ¶ 37.  DMC alleges that CMTA initiated this contact with Mount Auburn to interfere with DMC's projects, and that DMC has suffered economic and reputational harm as a result of CMTA's actions.  Id. ¶¶ 30, 44.

## IV.    Procedural History

CMTA initiated this action on February 28, 2025, D. 1, and filed an amended complaint on May 27, 2025.  D. 27.  E3i filed an answer and amended crossclaim against Mulkerrin and Center on June 10, 2025, D. 32, which each answered separately.  D. 36; D. 49.  DMC and Mulkerrin answered the amended complaint, and DMC filed amended counterclaims, on June 10, 2025.  D. 33.  Dussault has now moved to dismiss Count VI of the amended complaint.  D. 31. Center has moved to dismiss all claims against him in the amended complaint.  D. 47.  CMTA has moved to dismiss the amended counterclaims.  D. 41.  The Court heard the parties on the pending motions and took these matters under advisement.  D. 58.

## V.    Discussion

### A.    <u>Motions to Dismiss CMTA's Amended Complaint</u>

#### 1.    *Tortious Interference with Prospective Economic Advantage (Count III against Center)*

Massachusetts courts recognize multiple interference torts and do not always distinguish between them.  <u>Blackstone v. Cashman</u>, 448 Mass. 255, 260 n.9 (2007).  To state a claim for intentional interference with business relations requires a plaintiff to allege plausibly:  "(1) he had an advantageous relationship with a third party (e.g., a present or prospective contract or employment relationship); (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant's interference with the relationship, in addition to being intentional, was improper

in motive or means; and (4) the plaintiff was harmed by the defendant's actions."  Id. at 260; Conformis, Inc. v. Aetna, Inc., 58 F.4th 517, 538-39 (1st Cir. 2023).  "[M]alice, in the sense of ill will," is generally not "a true element of the torts of intentional interference either with a contract or with a prospective contractual relation."  United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 814 (1990).  Rather, to support a claim, the alleged interference must be intentional and done for an improper purpose or using improper means.  See id. at 816-17.  "Violation of a statute or a rule of common law or use of threats, misrepresentations of facts or other improper means provides a sufficient improper motive or means."  InVentiv Health Consulting, Inc. v. Equitas Life Scis., 289 F. Supp. 3d 272, 283 (D. Mass. 2017) (internal citations and quotation marks omitted); see Geltman, 406 Mass. at 817.  Action to advance one's own economic interest, without more, does not amount to improper motive.  TalentBurst, Inc. v. Collabera, Inc., 567 F. Supp. 2d 261, 269 (D. Mass. 2008).

Here, the amended complaint specifically identifies Center in connection with three projects.  First, with respect to a BILH project of which CMTA was apparently ignorant, CMTA alleges that Center and Dussault received a kickoff call invitation from an architectural firm in September 2024.  D. 27 ¶¶ 99, 104.  A few weeks later, Center and Dussault allegedly emailed the firm about the project, and on the same day a different e3i employee submitted a drawing for the project with e3i and CMTA logos.  Id. ¶¶ 100-02.  Second, with respect to the New Hampshire bottling plant project for which Dussault submitted a proposal on CMTA letterhead, id. ¶¶ 106-07, CMTA alleges that Center and Dussault received an email from Mulkerrin's DMC email address on January 10, 2025, asking them to review a project proposal.  Id. ¶ 111.  CMTA alleges, upon information and belief, that Center continues working on the BILH and bottling plant projects today.  See id. ¶¶ 105, 113.  Third, with respect to projects for Citizens Bank, CMTA alleges that

Center attended a meeting on e3i's behalf in May 2024, id. ¶ 138, that Dussault at some point accessed a related file using a file path containing the name "Ryan," id. ¶ 139, and that Center emailed Dussault and Mulkerrin on January 10, 2025, stating that he was "in the middle of a ton of Citizens coordination," id. ¶ 141.  CMTA further alleges, upon information and belief, that Center and other defendants had a relationship with Citizens Bank and conspired with Dussault to provide services without CMTA's knowledge.  Id. ¶ 143.  Although CMTA alleges that Dussault used CMTA resources for Citizens Bank projects and logged into a related meeting using his CMTA email, it is unclear from the complaint whether any materials using CMTA letterhead or other branding were submitted to Citizens Bank.  See id. ¶¶ 137-43.

The Court agrees with Center that the tortious interference claim against him must be dismissed, at least because CMTA has failed to allege plausibly that Center acted with requisite intent to induce a break in any relationship CMTA had with these three companies.  See Blackstone, 448 Mass. at 260.  CMTA defends its claim only as it relates to BILH.  See D. 53 at 9-10.  Although it is reasonable to infer that Center was aware BILH would have believed CMTA was involved in the project because e3i submitted a proposal including CMTA's logo, see D. 27 ¶¶ 101-02, CMTA has not alleged any facts from which the Court could reasonably infer that Center knew this was false.  See Cutting Edge Homes, Inc. v. Mayer, 103 Mass. App. Ct. 749, 753 n.6 (2024) (reiterating that intent to induce break in relations is required, separate from improper motive or means).  CMTA's arguments to the contrary only underscore the speculative nature of this claim against Center.  See D. 53 at 7 (arguing that it is reasonable to infer Center was aware of Dussault's alleged wrongdoing because CMTA was not paid for BILH project, "e3i" likely knew CMTA was not being compensated and Center "would presumably know that engineering firms perform their services in exchange for compensation").  While CMTA's burden to plead

knowledge and intent at this stage is not particularly demanding, see Conformis, 58 F.4th at 539-40, the allegations here are not "sufficient to lift this claim above the realm of mere speculation," cf. id. at 539.  For at least these reasons, the Court allows Center's motion to dismiss as to Count III.

### 2.    *Unjust Enrichment (Count V against Center)*

"Unjust enrichment is the 'retention of money or property of another against the fundamental principles of justice or equity and good conscience.'" Columbia Plaza Assocs. v. Ne. Univ., 493 Mass. 570, 588-89 (2024) (quoting Sacks v. Dissinger, 488 Mass. 780, 789 (2021)). Massachusetts courts "have typically used unjust enrichment for quasi contractual matters or to undo property transfers tainted by fraud, bad faith, or violation of a duty." Lanier v. President & Fellows of Harvard Coll., 490 Mass. 37, 69 (2022) (Budd, C.J., concurring).  To prevail on this claim, CMTA must show:  "(1) it conferred a measurable benefit upon [Center]; (2) it reasonably expected compensation from [Center]; and (3) [Center] accepted the benefit with the knowledge, actual or chargeable, of [CMTA's] reasonable expectation." Stewart Title Guar. Co. v. Kelly, 97 Mass. App. Ct. 325, 335 (2020).

Here, CTMA has not advanced any theory of unjust enrichment sounding in quasi contract. See SiOnyx, LLC v. Hamamatsu Photonics K.K., 332 F. Supp. 3d 446, 475 (D. Mass. 2018) (explaining that unjust enrichment "is not an available remedy against third parties that never had a quasi-contractual relationship with a plaintiff").  The unjust enrichment theory in the amended complaint is, instead, that Center has wrongfully accepted revenue from third parties after leading them to falsely believe they were receiving services from CMTA.  D. 27 ¶ 183.  As already discussed, however, CMTA fails to allege sufficient facts supporting such theory of wrongdoing

by Center.[2]  Cf. Branch v. F.D.I.C., 825 F. Supp. 384, 411 (D. Mass. 1993) (stating "general

rule . . . that an action for restitution may be maintained not only against [a] fiduciary, but against

any third party who colludes with the fiduciary or knowingly obtains a benefit from the breach [of

fiduciary duty]").   While it is possible to recover on an unjust enrichment claim against an

"innocent" recipient of money or property "in some limited circumstances," GCP Newton GP,

LLC v. Commonwealth Dev. LLC, 105 Mass. App. Ct. 416, 421 (2025) (collecting cases), CMTA

has not asserted such a theory against Center.  See D. 27 ¶ 183; D. 53 at 10-11; Sacks, 488 Mass.

at 790 n.13 (explaining that plaintiff proceeding under innocent recipient theory must give fair

notice of same).  Accordingly, the Court allows Center's motion to dismiss as to Count V.[3]

3.    Aiding and Abetting Breach of Fiduciary Duty (Count VII against Center)

To establish a claim for aiding and abetting breach of fiduciary duty, CMTA must show:

(1) a breach of fiduciary duty, (2) Center's knowledge of the breach and (3) Center's active

participation or substantial assistance in or encouragement of the breach to the degree that he could

---

[2] For at least that reason, Koufos v. U.S. Bank, N.A., 939 F. Supp. 2d 40 (D. Mass. 2013), amended in part (July 1, 2013), is inapposite.  There, the mortgagor plaintiff alleged that after the mortgagee sold plaintiff's mortgage and loan, one defendant "purported to assign the [plaintiff's] mortgage and note to" the other, and the latter then initiated foreclosure proceedings against the plaintiff.  Id. at 45.  In those circumstances, the Court ultimately allowed an unjust enrichment claim to proceed against those two defendants, who had also allegedly retained money from plaintiff's monthly mortgage payments.  See id. at 56.

[3] The Court also notes that here, CMTA identifies payments from third parties to Center as the basis for its claim, rather than conferral of any benefit by CMTA to Center.  See Marion Fam. Chiropractic, Inc. v. Seaside Fam. Chiropractic, LLC, No. 21-cv-11930-MPK, 2022 WL 1003963, at *10 (D. Mass. Apr. 4, 2022) (dismissing unjust enrichment claim against competing entity and managing member thereof, where complaint sufficiently alleged that plaintiff conferred benefit directly to employee who opened competing practice, but did not do so with regard to those defendants).  CMTA now argues instead that the benefit Center received was "the assistance of [CMTA's] trusted employee, Dussault, on projects Center was working on individually, through e3i, or through DMC, and CMTA's resources that Dussault used to provide Center with this assistance."  D. 53 at 10.  While CMTA does not assert this theory in its complaint, see D. 27 ¶ 183, and cannot amend the complaint through its opposition to Center's motion to dismiss, this theory would fail for the reasons described above.

not reasonably be held to have acted in good faith.  See Arcidi v. Nat'l Ass'n of Gov't Emps., Inc., 447 Mass. 616, 623-24 (2006); see also Go-Best Assets Ltd. v. Citizens Bank of Mass., 463 Mass. 50, 64 (2012) (affirming summary judgment for defendant where there was "no evidence that [defendant] knew of [plaintiff's fiduciary's] intent to misappropriate [plaintiff's] funds or shared his intent to accomplish the misappropriation" and "no evidence that the [defendant] actively participated in or substantially assisted in" fiduciary's wrongdoing).  Here, similar to the claims above, CMTA's aiding and abetting claim fails because, even assuming the other elements are met, CMTA does not plausibly allege that Center was aware of any breach of fiduciary duty by Dussault.  See Cohen v. Brokers' Serv. Mktg. Grp. II, LLC, 87 Mass. App. Ct. 1121, 1121 (2015) (summary disposition) (affirming futility of motion to amend aiding and abetting claim where, inter alia, proposed amendment still failed to allege defendant's "actual knowledge that [tortfeasor] was stealing money from the [plaintiffs]"); cf. Barnia v. Kaur, No. 22-cv-10216-MJJ, 2024 WL 914780, at *8-10 (D. Mass. Feb. 1, 2024)  (rejecting argument that proposed aiding and abetting counterclaim was futile for lack of knowledge where it included factual allegations from which court could infer that proposed counter-defendant knew tortfeasor worked outside of relationship with counter-plaintiffs without their knowledge and knew that she should not reveal this to them).  The Court, therefore, allows Center's motion to dismiss as to Count VII.

### 4.    Civil Conspiracy (Count VIII against Center)

"Massachusetts law recognizes two distinct theories of liability under the umbrella term of civil conspiracy: [(1)] concerted action conspiracy and [(2)] true conspiracy based on coconspirators exerting some peculiar power of coercion."  Greene v. Philip Morris USA Inc., 491 Mass. 866, 871 (2023) (internal citation and quotation marks omitted).  CMTA alleges a concerted action conspiracy, see D. 27 ¶¶ 202-03, which applies to "a common plan to commit a tortious act

where the participants know of the plan and its purpose and take affirmative steps to encourage the achievement of the result," Greene, 491 Mass. at 871 (quoting Kurker v. Hill, 44 Mass. App. Ct. 184, 189 (1998)).[4]

CMTA contends that it need only plausibly allege (and has) that "Center was involved in Dussault's unauthorized work with knowledge that CMTA was not benefitting from it." See D. 53 at 13.[5] It relies upon Aarow Electrical Solutions v. Tricore Systems, LLC, 693 F. Supp. 3d 525 (D. Md. 2023), which applied Maryland law, and argues that its own allegations are "more robust" than the plaintiff's in that case, D. 53 at 14, in which the relevant individual defendant, a part-owner of the defendant competing business, allegedly provided feedback on a spreadsheet created by a then-employee of plaintiff, and "the spreadsheet detailed a five-year plan to open" a new division of a defendant competing business, which "would only be possible if [the business] was

---

[4] The First Circuit has articulated the concerted action conspiracy as having two theories, requiring a plaintiff to "show that [a] defendant[] either (1) acted 'in concert with or pursuant to a common design with' [a] tortfeasor or (2) 'gave substantial assistance to [or encouraged]' the tortfeasor's conduct." Thomas v. Harrington, 909 F.3d 483, 490 (1st Cir. 2018) (quoting Kyte v. Philip Morris Inc., 408 Mass. 162, 166 (1990)). Under the common design theory, a plaintiff must show (1) a common design or agreement between two or more persons to commit a tortious act and (2) proof of a tortious act in furtherance of that agreement. See id.; see also Greene, 491 Mass. at 871-72. Under the substantial assistance theory, a plaintiff must show that (1) the defendant knew that the conduct of another constituted a breach of duty and (2) the defendant substantially assisted in or encouraged that conduct. See Thomas, 909 F.3d at 491. These alternatives are based on Restatement (Second) of Torts § 876 and, as the First Circuit has recognized, Taylor v. Am. Chemistry Council, 576 F.3d 16, 34 n.20 (1st Cir. 2009), the Supreme Judicial Court has not "determine[d] whether the principles of § 876 and the law of the Commonwealth are, in all respects, in complete accord." Kyte, 408 Mass. at 167 (analyzing both theories where "the parties accept[ed them] as stating the governing principles of civil conspiracy in the Commonwealth"). While the Court here applies the standard as most recently recited by the Supreme Judicial Court, which mirrors the substantial assistance theory, CMTA's claim would also fail under the common design theory.

[5] CMTA recites the standard for civil conspiracy under Texas law. See D. 53 at 12 (citing Natale v. Espy Corp., 2 F. Supp. 3d 93, 105 (D. Mass. 2014)). The Court is aware of no reason to apply Texas law to this claim, and it treats CMTA's citation as inadvertent given that CMTA separately suggests in its brief that Natale applied Massachusetts law. See D. 53 at 13 n.6.

bringing in existing work." Aarow, 693 F. Supp. 3d at 544-45. For the reasons already discussed, however, CMTA has not adequately alleged Center's knowing participation in any wrongdoing perpetrated by Dussault, which means that CMTA's conspiracy claim lacks a "[k]ey" component under Massachusetts law. See Kurker, 44 Mass. App. Ct. at 189; Thomas, 909 F.3d at 491 (explaining that even "showing the defendant's 'general awareness' that their ostensible co-conspirator is engaged in tortious acts is insufficient" (quoting Kyte, 408 Mass. at 168)). Accordingly, the Court allows Center's motion to dismiss as to Count VIII.

5.    *Violations of Chapter 93A (Count VI against Center and Dussault)*

Chapter 93A makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 243 (1st Cir. 2005) (alteration in original) (quoting Mass. Gen. L. c. 93A, § 2). Where, as here, a plaintiff brings a claim under § 11, see D. 27 ¶ 187, it must show: "(1) the defendant engaged in an unfair method of competition or committed an unfair deceptive act or practice; (2) a loss of money or property was suffered; and (3) the defendant's unfair or deceptive method, act or practice caused the loss suffered." Anoush Cab, Inc. v. Uber Techs., Inc., 8 F.4th 1, 16 (1st Cir. 2021). To determine if an act or practice is unfair under Chapter 93A, courts look to "(1) whether the conduct is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers or other businesses." H1 Lincoln, Inc. v. S. Washington St., LLC, 489 Mass. 1, 14 (2022) (alteration in original) (internal citation and quotation marks omitted); see Tomasella v. Nestlé USA, Inc., 962 F.3d 60, 79 (1st Cir. 2020). An act or practice is deceptive "if it possesses a tendency to deceive and if it could reasonably be found to have caused a person to act differently from the way he [or

she] otherwise would have acted." Tomasella, 962 F.3d at 70 (alteration in original) (internal citation and quotation marks omitted). Deceptive conduct can include both "affirmative misrepresentations" and "certain kinds of nondisclosures." See id. at 71.

a)    Center

Here, with respect to Center, CMTA alleges that Center's unfair and deceptive acts include conspiring with Mulkerrin, DMC, e3i and Dussault to provide, and receiving payment for, engineering services on CMTA's corporate opportunities. See D. 27 ¶ 190. To the extent CMTA's claim is premised on its other claims against Center, see D. 53 at 14-15 (arguing same), it fails for the same reasons those claims fail. CMTA's alternative argument that the claim is supported by its allegations that "[D]efendants' submissions on [certain] projects indicated that CMTA would work on them when, in fact, CMTA had no knowledge of those projects," id. at 15, fares no better. "[L]iability under Chapter 93A does not attach to a party simply because it had a relationship to the defendant that engaged in the complained-of conduct; each defendant must have taken an 'active role' in that conduct." Speakman v. Allmerica Fin. Life Ins., 367 F. Supp. 2d 122, 142 (D. Mass. 2005). Accordingly, the Court allows Center's motion to dismiss as to Count VI.

b)    Dussault

Dussault argues that this Court should dismiss CMTA's Chapter 93A claim against him because the statute does not apply to employee-employer relationships. D. 31 at 7.[6] Dussault also argues that, even if the statute applies, his alleged outside work does not constitute an unfair practice as a matter of law. Id. at 3-7.

---

[6] Dussault filed a reply brief in support of his partial motion to dismiss, in contravention of this Court's Local Rules requiring leave of court for same. See L.R. 7.1(b)(3). Although the Court has considered Dussault's reply brief, D. 44, in deciding the present motion, the Court will strike any future filings that do not comply with Local Rule 7.1(b)(3). See L.R. 1.3.

As an initial matter, the Court notes that many of Dussault's characterizations of the allegations in the amended complaint are, at best, erroneous. For instance, Dussault asserts that "there can be no dispute that the performance of outside work by Dussault was within [CMTA's] expectations" because the CMTA employee handbook contemplates outside work. See D. 31 at 2-3; see also id. at 7 (arguing that "the conduct complained of by CMTA is work that was expressly permitted by CMTA's own policies"); D. 44 at 2 (arguing that CMTA "does not dispute that it expressly permitted . . . Dussault to engage in outside activities"). Dussault omits that, as alleged, CMTA's outside work policy (1) prohibits outside work that conflicts or competes with CMTA's interests or is conducted during work hours, (2) prohibits outside work "for customers or clients that CMTA would normally expect to perform," (3) prohibits employees from using CMTA resources or confidential information for outside work and (4) requires review by CMTA. D. 27 ¶ 23; see D. 37 at 12. At a more basic level, Dussault does not acknowledge CMTA's specific allegation that "CMTA never authorized Dussault to provide these outside engineering services." D. 27 ¶ 33. Similarly, Dussault contends that CMTA "bungle[d]" allegations regarding Dussault's use of external hard drives because employees engaging in outside work are not permitted to use CMTA resources, D. 31 at 5, but this ignores specific allegations that Dussault connected external systems to his CMTA-issued computer, see D. 27 ¶¶ 2, 40, 41, 54, 55, 60, 87, 122, 135, 139, 144.

Turning to Dussault's argument that CMTA's claim is outside the scope of Chapter 93A, D. 31 at 7; D. 44 at 3-5, Dussault is correct that § 11 "does not apply to employer-employee disputes arising out of the employment relationship." Governo L. Firm LLC v. Bergeron, 487 Mass. 188, 195 (2021); see Manning v. Zuckerman, 388 Mass. 8, 13 (1983) (interpreting § 11 to apply "to marketplace transactions and not to claims arising from the ordinarily cooperative circumstances of the employment relationship between an employee and the organization of which

he is a member"). In <u>Governo</u>, however, the Supreme Judicial Court recognized that there are limits to the so-called intra-enterprise doctrine, such as where a former employee "misappropriate[d] his . . . [former] employer's proprietary materials during the course of employment and then use[d] the purloined materials in the marketplace." <u>Governo</u>, 487 Mass. at 195; see <u>Cynosure, LLC v. Reveal Lasers LLC</u>, 793 F. Supp. 3d 315, 353 (D. Mass. 2025) (concluding intra-enterprise doctrine did not bar Chapter 93A claim against former employee who "misappropriated [employer's] trade secrets while he was planning to launch a competing endeavor" and "a reasonable inference [was] that he did so in order to use the information on behalf of" competitor); <u>cf. Barnia</u>, 2024 WL 914780, at *7 (noting, in denying motion to amend as futile, that proposed Chapter 93A claim included "no allegation that [proposed counter-defendant] was actively involved with other [dental] practices while employed by [counter-plaintiff]").

While the amended complaint is replete with allegations that Dussault used CMTA resources to perform unauthorized outside work, <u>see, e.g.</u>, D. 27 ¶ 81, and CMTA generally alleges that Dussault had access to certain "confidential and sensitive business information," <u>id.</u> ¶ 18, there are no specific allegations that Dussault misappropriated proprietary information and then used it in the marketplace after his departure from CMTA. <u>See generally id.</u> This, however, does not doom CMTA's Chapter 93A claim. Even before <u>Governo</u>, courts had declined to apply the intra-enterprise doctrine where a defendant took steps to compete with the plaintiff. <u>See Juncker Assocs. & Co. v. Enes</u>, No. 00-2098-C, 2002 WL 31104013, at *3 (Mass. Super. Ct. Sept. 5, 2002) (concluding that doctrine did not bar Chapter 93A claim against former employee who created competing sole proprietorship during employment, diverted opportunities to own business, received undisclosed payments from plaintiff's customers and continued to compete with plaintiff

after employment, because defendant was acting as agent of sole proprietorship). Moreover, while Dussault attempts to cabin <u>Governo</u> to its facts, D. 44 at 3-4, its applicability is not so limited. <u>See, e.g.</u>, <u>Cynosure</u>, 793 F. Supp. 3d at 351-52 (concluding intra-enterprise doctrine did not bar claims against defendant former employees of plaintiff based on "raid" of plaintiff's sales force, where defendants recruited colleagues to join new entity during and after defendants' employment with plaintiff); <u>Russo v. Manzoli</u>, No. 2181-cv-01738, 2021 WL 6210647, at *4 (Mass. Super. Ct. Dec. 14, 2021) (declining to dismiss Chapter 93A claim against equal partner in dental practice based on intra-enterprise doctrine, where complaint alleged "conduct that step[ped] in the commercial marketplace and out of the intra-corporate context," including conduct that would interfere with practice's ability to compete in marketplace).[7] Here, CMTA alleges, *inter alia*, that over a lengthy period during and after his employment, Dussault secretly competed with CMTA for his own gain, sometimes holding himself out as CMTA's agent and sometimes not. <u>See, e.g.</u>, D. 27 ¶¶ 29-33, 38, 48-49, 64-65, 67-68, 76-78, 85-86, 102-04, 117-18. Drawing all reasonable inferences in CMTA's favor, as the Court must at this stage, the intra-enterprise doctrine does not preclude CMTA's Chapter 93A claim here. <u>See</u> <u>Cynosure</u>, 793 F. Supp. 3d at 351-53; <u>Governo</u>, 487 Mass. at 195-96.

Dussault next argues that CMTA's claim must be dismissed because, as a matter of law, the alleged conduct is not sufficiently egregious to warrant Chapter 93A liability. <u>See</u> D. 31 at 4. The heart of Dussault's argument is that the allegations do not rise to the level of a Chapter 93A

---

[7] Dussault attempts to distinguish <u>Juncker</u> and <u>Russo</u> because, he says again, his outside work was permitted by CMTA. D. 44 at 5. This argument directly contradicts the amended complaint, which includes allegations that Dussault's outside work competed with CMTA's interests, <u>see, e.g.</u>, D. 27 ¶¶ 48-49, that its outside work policy expressly prohibits same, <u>id.</u> ¶ 23, that the same policy requires CMTA review of employee outside work to ensure it presents no issues, <u>id.</u>, and that CMTA did not, in fact, authorize such work, <u>id.</u> ¶ 33.

violation because he was permitted to engage in outside work.  See id. at 6; D. 44 at 5.  Dussault, however, concedes that Chapter 93A liability could attach to him if CMTA "prohibited outside work," D. 31 at 6 (emphasis in original), which is exactly what CMTA alleges as applied to Dussault, despite Dussault's failure to acknowledge same, see, supra, note 7.

The Court concludes that at least some of CMTA's allegations do not fall within the bar of the intra-enterprise doctrine, and that these allegations state a claim for a violation of Chapter 93A. Accordingly, the Court denies Dussault's motion to dismiss as to Count VI.  D. 31.

### B.    Motion to Dismiss DMC's Counterclaims

DMC has counterclaimed against CMTA for tortious interference with a business relationship with respect to the Mount Auburn projects (Counterclaim Count I) and the BIDMC relationship (Counterclaim Count II). D. 33 ¶¶ 45-56.  In its motion to dismiss, CMTA focuses on the third element of tortious interference, arguing that DMC has failed to plausibly allege that any interference was improper.  See D. 42 at 5.  Rather, CMTA contends, DMC has "[a]t most" alleged that "CMTA contacted DMC's clients to obtain work from them, protect CMTA's interests, and enforce its legal rights against DMC, Dussault, and Mulkerrin."  Id. at 7.  DMC argues that it plausibly alleges, in essence, that CMTA initiated a lawsuit based on false allegations against DMC and involving DMC clients, then used a threat of involvement in the lawsuit to steal DMC's business with those clients.  See D. 45 at 10.[8]

As an initial matter, the parties disagree about whether the heightened actual malice standard applies to DMC's counterclaims.  See D. 42 at 6; D. 45 at 2; D. 55 at 2-4.  Where a

---

[8] DMC overreads Bruno International Ltd. v. Vicor Corp., No. 14-cv-10037-DPW, 2015 WL 5447652, at *1 (D. Mass. Sept. 16, 2015), in suggesting that its "direct competitor" distinction applies in these circumstances to support DMC's claims.  See D. 45 at 8 n.5.  In Bruno, the parties had a "distributor-supplier relationship," which created a "reasonable assumption that [the defendant] would support [the plaintiff's] endeavors . . . rather than thwart them."  Bruno, 2015 WL 5447652, at *16.  That is not the case here.

corporate official is accused of tortiously interfering with "contractual or prospective contractual relations between the corporation and its employees," there is an "actual malice" standard that places a heightened burden on the plaintiff.  See Blackstone, 448 Mass. at 260-62.  Rather than improper motive or means, actual malice analysis involves "a single question, whether the controlling factor in the alleged interference was actual malice," i.e., "a spiteful, malignant purpose unrelated to a legitimate corporate interest."  Id. at 270; see Barr Inc. v. Studio One, Inc., 146 F. Supp. 3d 375, 380-81 (D. Mass. 2015) (explaining scope of standard).  The standard only applies "where a defendant raises a claim that he qualifies as a corporate official."  Weiler v. PortfolioScope, Inc., 469 Mass. 75, 86 (2014).  While the Supreme Judicial Court has reaffirmed that the actual malice standard is intended to protect corporate officials in certain internal company decisions, see Bresler v. Muster, 496 Mass. 111, 117 n.5 (2025), courts do not always limit recitation of the standard to that context, see, e.g., Columbia Plaza, 493 Mass. at 588 (citing standard in suit by developer with alleged interest in land against third-party landowner but analyzing whether plaintiff identified any "improper motive or means").  The Court agrees with DMC that it need not meet the heightened standard here.  See D. 45 at 2, 6 n.3; Blackstone, 448 Mass. at 265 (affirming that "the actual malice standard [is] the correct standard to apply when an unlawful interference claim is asserted by an employee against an official of the employer").

Even under the typical improper motive or means standard, however, DMC has failed to plausibly allege that CMTA tortiously interfered with its relationships with BILH/BIDMC.  DMC alleges, upon information and belief, that CMTA informed certain DMC clients of some false allegations and "suggested that [those clients] stop working with DMC."  D. 33 ¶ 23.  But with regard to BILH/BIDMC, whose projects support DMC's two claims, DMC alleges only that during a communication between CMTA and a Mount Auburn (i.e., BILH) representative, the BILH

representative "stated [to CMTA] that BILH/BIDMC did not want to be involved in CMTA's lawsuit or in depositions." See id. ¶¶ 30-31; id. ¶ 34 (alleging BIDMC representative informed Dussault that "he had been made aware of the legal dispute and he had been directed to stop" DMC projects); id. ¶ 35 (alleging BILH representative informed Dussault that "they did not want to get caught up in the allegations made by CMTA"); id. ¶ 40 (alleging BIDMC project manager informed Dussault that "they had been made aware of legal action"). DMC has not pled sufficient facts to support its claim that CMTA used improper means—i.e., "the threats of involvement in a lawsuit or, conversely, the promises of less involvement," D. 45 at 11—to interfere with DMC's business relationships. Cf. Hamann v. Carpenter, 937 F.3d 86, 92 (1st Cir. 2019) (concluding plaintiff plausibly alleged improper interference where complaint included "specific allegation that [defendant] threatened [third party] with the destruction of another important business relationship . . . so as to induce [third party] to breach his existing agreement with [plaintiff]");[9] Conformis, 58 F.4th at 540 (concluding plaintiff plausibly alleged improper means where it also stated claim for product disparagement); see Bryan v. Ascend Learning, LLC, No. 24-cv-10583-ADB, 2024 WL 5170211, at *9 (D. Mass. Dec. 19, 2024) (noting that defendants' act of calling own clients, who were also prospective clients of plaintiffs, to alert them to allegations in

---

[9] While the Court is not persuaded by DMC's reliance upon Hamann because of these factual differences, the Court separately notes that, to the extent DMC believes that a different standard applies to tortious interference with contractual relations claims, see D. 45 at 8, it is not clear DMC alleged such claims here. DMC does allege that BILH/BIDMC approved its Mount Auburn proposals, D. 33 ¶ 29, and that DMC submitted a proposal for a BIDMC MSA and "was informed that [DMC] would be getting future work with BIDMC as a result of [its] submission," id. ¶ 39. "Even under the lenient plausibility standard," however, "a plaintiff must furnish enough detail about the obligations of the alleged contracts to allow a reasoned determination as to whether the second element [of tortious interference] – breach of contract – is alleged." Conformis, 58 F.4th at 538.

defendants' separate lawsuit against plaintiffs, was not itself improper interference).[10]
Accordingly, the Court allows CMTA's motion to dismiss.  D. 41.

## VI.    Conclusion

For the foregoing reasons, the Court DENIES Dussault's motion to dismiss Count VI (Chapter 93A claim) of the amended complaint.  D. 31.  The Court ALLOWS CMTA's motion to dismiss DMC's counterclaims.  D. 41.  The Court ALLOWS Center's motion to dismiss all claims in the amended complaint against him without prejudice.  D. 47.[11]

**So Ordered.**

/s Denise J. Casper
Chief United States District Judge

---

[10] Although the court in Bryan recited the actual malice standard, id. at *8, its analysis discussed improper motive or means, see id. at *9.  Additionally, as counsel raised during oral argument, the court's subsequent decision dismissing an amended version of the complaint did not discuss the actual malice standard.  Bryan v. Ascend Learning, LLC, No. 24-cv-10583-ADB, 2025 WL 2239250, at *5-7 (D. Mass. Aug. 6, 2025).

[11] In a footnote on the last page of its brief, CMTA asks that any dismissal of its claims against Center be "without prejudice to CMTA's right to amend the operative complaint in the event discovery confirms his wrongdoing."  D. 53 at 15 n.7.  "The general rule . . . is that a district court need not pay heed to a contingent request for leave to amend made only in opposition papers."  Amyndas Pharms., S.A. v. Zealand Pharma A/S, 48 F.4th 18, 38 n.6 (1st Cir. 2022).  The Court, however, dismisses the claims against Center without prejudice, but to the extent CMTA seeks to amend its complaint again, it must seek leave to do so no later than any deadline for amendment of pleadings, which the Court will set at the initial scheduling conference.