**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| CMTA, INC., | ) ) ) ) | |
| Plaintiff | ) ) | |
| v. | ) ) ) | Case No. 25-cv-10490-DJC |
| JOSEPH DUSSAULT, BRIAN MULKERRIN, DMC CONSULTING ENGINEERS, LLC, and E3I ENGINEERS, INC., | ) ) ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM AND ORDER

**CASPER, C.J.**                                                  **July 17, 2026**

### I.    Introduction

Plaintiff and Counterclaim Defendant CMTA, Inc. ("CMTA") has filed this lawsuit against Defendants Joseph Dussault ("Dussault"), Brian Mulkerrin ("Mulkerrin"), e3i Engineers, Inc. ("e3i") and DMC Consulting Engineers, LLC ("DMC"), asserting various state law claims.  D. 27. Dussault has counterclaimed against CMTA for breach of contract (Counterclaim Count I) and the implied covenant of good faith and fair dealing (Counterclaim Count II), violations of Massachusetts General Laws chapter 93A ("Chapter 93A") (Counterclaim Count III) and defamation (Counterclaim Count IV).  D. 82.  CMTA now moves to dismiss Dussault's amended counterclaims.  D. 84.  For the reasons stated below, the Court ALLOWS the motion and dismisses the amended counterclaims without prejudice.

1

## II.    Standard of Review

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must determine if the facts alleged "plausibly narrate a claim for relief." Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012). Reading the pleading "as a whole," the Court conducts a two-step, context-specific inquiry. García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013). First, the Court must closely review the pleading to distinguish the factual allegations from the conclusory legal allegations. Id. Factual allegations must be accepted as true, while legal conclusions are not entitled to credit. Id. Second, the Court must determine whether the factual allegations support a "reasonable inference that the defendant is liable for the misconduct alleged." Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

## III.    Factual Background

The Court draws the following facts from Dussault's amended counterclaims and documents "sufficiently referred to" therein. See Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993).

Dussault is an experienced mechanical engineer who specializes in the healthcare and higher education sectors. D. 82 ¶¶ 5, 14.[1] Dussault signed an offer of employment with CMTA on September 6, 2020. Id. ¶ 19; D. 85-1 at 2. The offer letter did not indicate that Dussault was to be an "officer or director" of CMTA and "was silent as to working outside his employment by CMTA." D. 82 ¶¶ 21-22. Dussault understood his employment to be at-will employment. Id. ¶¶ 36, 97-98. After Dussault accepted CMTA's employment offer, on approximately September 16, 2020, a CMTA employee "wrote to [Dussault] in regard to a non-competition provision,

---

[1] The Court uses "¶" here in reference to the paragraphs of the amended counterclaims rather than Dussault's answer to the amended complaint. See D. 82 at 25-47.

'[t]here is boiler plate non-compete (sic) language at page 21 but we can waive if need be, [l]et's get this done partner.'" See id. ¶ 23. As alleged, CMTA knew that Dussault would not sign a noncompetition agreement because Dussault wanted to work on his own outside of his hours of employment. Id. ¶ 24. Dussault alleges that at his "insistence," before he executed the employment offer, CMTA agreed, through its then-president, Jim Benson ("Benson"), "to remove all restrictive covenants from the terms of [Dussault's] employment." Id. ¶ 26. Per CMTA's offer letter, Dussault was to be issued five shares of company stock, financed via an upfront payment of $30,000 by Dussault and $55,000 in additional payments paid out of Dussault's annual bonus. Id. ¶ 27; D. 85-1 at 2.[2]

Before his employment with CMTA, Dussault worked at the engineering firm BR+A Consulting Engineers, where he was permitted to "moonlight" and did so. Id. ¶¶ 15-17. Dussault planned to moonlight while employed by CMTA. Id. ¶ 18. Dussault alleges that "CMTA hired [him] in anticipation of [his] continuing to provide services to his then existing client base," that CMTA "expected [him] to bring his client base with him when he joined CMTA" and that many of his clients did follow him to CMTA. Id. ¶¶ 28-30, 57, 78.

Dussault provided engineering services "to entities outside the scope of his work at CMTA," and he alleges that at all relevant times, "certain management personnel at CMTA" were aware of same. Id. ¶¶ 56, 58. As alleged, CMTA never prohibited Dussault from engaging in outside work; he did not need permission to engage in outside work; and he engaged in same "openly and obviously," in a manner that did not "conflict or compete with CMTA's interests" and without use of CMTA's confidential or proprietary information. Id. ¶¶ 83-84, 89-90, 95, 99,

---

[2] As alleged, this was stock in "CMTA's parent company." D. 82 ¶ 27. The offer letter identifies it as "CMTA stock." D. 85-1 at 2.

101, 103-05.  Further, Dussault did not divert any corporate opportunities or fees owed to CMTA for his own benefit.  Id. ¶ 102.  As alleged, Dussault's outside work was consistent with CMTA policy permitting same and did not negatively impact his work at CMTA or harm CMTA financially, and Dussault consistently delivered high-quality work to CMTA and received no complaints about either form of work.  See id. ¶¶ 59-62, 91-94, 96, 100; see also D. 85-2 at 2, 11.

After CMTA's acquisition by "Therma Holdings LLC (now known as Legence)" in 2021, D. 82 ¶¶ 32-34,[3] Dussault was removed from his position as co-manager of CMTA's Framingham, Massachusetts office, which was subsequently managed by CMTA Vice President Jess Farber ("Farber").  Id. ¶¶ 38-39.  As alleged, Dussault "has not been an office manager, officer, 'partner' or director of CMTA" since the acquisition.  Id. ¶ 37.  After the acquisition, CMTA presented Dussault with an employment-related agreement that contained new restrictive covenants, and he alleges that he was the only employee who refused to sign.  Id. ¶¶ 42-43.[4]

In or around September 2024, Dussault notified CMTA that he was contemplating his departure from the company.  Id. ¶ 106.  Dussault exchanged text messages with Benson and then CMTA's chief human resources officer, and CMTA "agreed to work towards a mutual resolution of any issues and seamless transition."  Id. ¶¶ 107, 108.  On approximately September 15, 2024,

---

[3] CMTA submitted a heavily redacted Equity Purchase Agreement and Rollover and Contribution Agreement involving "Refficiency Therma LLC," CMTA, "Refficiency Parent LLC," Dussault and others.  D. 85-3 at 6, 86-88; D. 85-4 at 2, 12-14, 16.  Neither party has explained the relationship between "Therma Holdings LLC" and the parties identified in these agreements.  In any event, it is not clear that these exhibits are properly before the Court at this motion to dismiss stage.  See Watterson, 987 F.2d at 3.  Similarly, at the motion hearing, the Court allowed CMTA's motion for leave to file a reply brief, D. 91, and although the Court has considered the reply, D. 88 at 6-15, it has not considered the purported draft separation agreement appended thereto, id. at 18-27.

[4] The Court uses "CMTA," but Dussault refers to "the company" here and in several other paragraphs without clarifying whether he intends to reference CMTA or another, related entity. See, e.g., D. 82 ¶¶ 41-42, 64, 66.

Benson asked Dussault to close out all projects and avoid contact with anyone in CMTA's Boston and Framingham offices for the remainder of the year, and Dussault chose to comply. Id. ¶¶ 63, 67. Benson informed Dussault that CMTA was willing to prorate Dussault's compensation and bonus if he left prior to the end of the calendar year and suggested that Dussault could "start his own business, work at Lahey and make a million dollars." Id. ¶¶ 64-65. Dussault asked Benson about redemption of his company shares, and Benson informed Dussault that CMTA would repurchase same if Dussault signed a restrictive covenant agreement. Id. ¶ 66. On approximately September 16, 2024, Farber and another CMTA employee informed employees in CMTA's Boston office that Dussault's employment had been terminated, effective immediately. Id. ¶¶ 72, 74.

On January 11, 2025, Dussault "was informed he would receive approximately $337,000 for the shares he owned in the parent company." Id. ¶ 79. Dussault's employment with CMTA ended on January 17, 2025, and he became a DMC employee on January 20, 2025. Id. ¶¶ 85, 109. Dussault alleges that when his CMTA employment ended, "CMTA acknowledged it unconditionally owed [him] $356,326.78 for approximately 356 Series C vested shares of CMTA's parent company." Id. ¶ 111.

In the weeks following Dussault's departure, CMTA unsuccessfully attempted to negotiate certain terms for a separation agreement. Id. ¶ 110. On approximately January 20, 2025, Dussault "received a non-solicit agreement from CMTA in exchange for the purchase of his shares," and he requested changes to proposed restrictions on his ability to work with his preexisting clients. Id. ¶ 68. Weeks later, CMTA rescinded its offer, and it has refused to pay Dussault the value of his shares. Id. ¶¶ 69, 71, 80.

CMTA initiated this action on February 28, 2025.  Id. ¶ 138; D. 1.  Dussault makes allegations in his counterclaim disputing certain allegations made by CMTA in its pleading.  For instance, Dussault alleges that "CMTA has falsely stated in its [c]omplaint and to [his] clients and former clients that it had not authorized [him] to engage in outside work, and [that] Dussault allegedly performed services using CMTA resources but concealed the outside work, including by saving relevant files on external storage media and failing to inform CMTA of the relevant business opportunities."  D. 82 ¶ 88; see id. ¶ 144.  Dussault alleges that certain entities "identified by CMTA in its [c]omplaint as clients potentially improperly solicited by [Dussault]" are "potential clients that CMTA refused to accept work from in 2024."  Id. ¶¶ 112-13.  Dussault alleges, upon information and belief, that individuals affiliated with CMTA "relayed at least some of the false allegations set forth in the [a]mended [c]omplaint to certain colleagues, clients and contacts of [Dussault] and suggested that they stop working with [him] and [DMC]."  Id. ¶¶ 127, 145.

As alleged in his counterclaims, CMTA's actions caused certain clients to stop working with Dussault.  Id. ¶ 128.  In particular, Dussault alleges, upon information and belief, that CMTA's misconduct reached "a representative of Mount Auburn Hospital, who stated to CMTA that BILH/BIDMC did not want to be involved in the lawsuit."  Id. ¶ 129.[5]  Possibly the same representative, although this is unclear, told Dussault that he "had been made aware of the legal dispute and . . . had been directed to stop the [Mount Auburn] projects."  Id. ¶ 131 (alterations in original); see id. ¶¶ 146-53.  Dussault was also told, possibly by the same person, that this person did not "want to be deposed" and was "going to call [Farber] back and let him know that [BILH was] giving the projects to CMTA."  Id. ¶ 133.  Additionally, Benson told a Harvard University

---

[5] Mount Auburn Hospital is part of Beth Israel Lahey Health ("BILH").  D. 82 ¶ 146.

representative "that [a] project [there was] currently the subject of litigation and the only way that CMTA would allow [Dussault] to continue to be involved with that project [was] if Harvard identified CMTA as the project design professional." Id. ¶ 137.

## IV.    Procedural History

CMTA initiated this action against Dussault, Mulkerrin, e3i, DMC and an additional defendant, Ryan Center ("Center"), on February 28, 2025, D. 1, and filed an amended complaint on May 27, 2025, D. 27.  E3i filed an answer and amended crossclaim against Mulkerrin and Center on June 10, 2025, D. 32, which each answered separately, D. 36; D. 49.  DMC and Mulkerrin answered the amended complaint, and DMC filed amended counterclaims, on June 10, 2025.  D. 33.  The Court subsequently denied Dussault's motion to dismiss Count VI of the amended complaint, allowed CMTA's motion to dismiss DMC's counterclaims and allowed Center's motion to dismiss the claims against him.  D. 59.  E3i and Center then stipulated to the dismissal of e3i's crossclaim against Center.  D. 75.

Dussault filed an answer to the amended complaint and four counterclaims against CMTA on March 30, 2026, D. 79, and amended same on April 17, 2026, D. 82.  CMTA now moves to dismiss Dussault's amended counterclaims.  D. 84.  The Court heard the parties on the pending motion and took the matter under advisement.  D. 91.

## V.    Discussion

### A.    <u>Breach of Contract (Counterclaim Count I) and the Implied Covenant of Good Faith and Fair Dealing (Counterclaim Count II)</u>

To state a claim for breach of contract under Massachusetts law, a plaintiff must plead (1) an agreement between the parties; (2) which was supported by consideration; (3) that the plaintiff was ready, willing and able to perform his part of the contract; (4) the defendant breached the contract; and (5) the plaintiff has suffered harm as a result.  Bulwer v. Mount Auburn Hosp.,

473 Mass. 672, 690 (2016).  "[I]t is essential to state with substantial certainty the facts showing the existence of the contract and the legal effect thereof."  Squeri v. Mount Ida Coll., 954 F.3d 56, 71 (1st Cir. 2020) (alteration in original) (internal quotation marks omitted) (quoting Tel. Answering Serv. of Bos., Inc. v. New England Tel. & Tel. Co., 358 Mass. 822, 822 (1971) (rescript)).  "Thus, a claim for breach of a written contract must either (1) quote pertinent contractual language; (2) contain a copy of the contract as an attachment; or (3) summarize the contract's purported legal effect."  Foss v. Marvic, 365 F. Supp. 3d 164, 167 (D. Mass. 2019), aff'd on other grounds, 994 F.3d 57 (1st Cir. 2021).  Moreover, the plaintiff must also identify "what obligations were imposed on each of the parties by the alleged contract."  Buck v. Am. Airlines, Inc., 476 F.3d 29, 38 (1st Cir. 2007) (quoting Doyle v. Hasbro, Inc., 103 F.3d 186, 195 (1st Cir. 1996)).

Under Massachusetts law, "[t]he covenant of good faith and fair dealing is implied in every contract."  Uno Rests., Inc. v. Bos. Kenmore Realty Corp., 441 Mass. 376, 385 (2004).  The covenant provides that "neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471 (1991) (quoting Druker v. Roland Wm. Jutras Assocs., Inc., 370 Mass. 383, 385 (1976)).  "However, the covenant does not create new rights and duties not already provided for in the contract."  Columbia Plaza Assocs. v. Ne. Univ., 493 Mass. 570, 586 (2024).

Here, Dussault's breach of contract and breach of the implied covenant of good faith and fair dealing claims both fail because he has not sufficiently alleged the existence of a contract with CMTA concerning the conduct he challenges.  In Counterclaim Count I, Dussault alleges that CMTA breached "an employment agreement."  D. 82 ¶¶ 154-58.  As explained in Dussault's

briefing, this counterclaim is premised on CMTA's failure to repurchase his shares in CMTA's parent company. See D. 86 at 6. The Court agrees with CMTA, however, that Dussault fails to plausibly allege that CMTA was contractually obligated to repurchase such shares. See D. 85 at 7-8; D. 88 at 8-10; see also Madden v. Ascensus Coll. Sav. Recordkeeping Servs., LLC, No. 20-cv-10565-FDS, 2021 WL 231298, at *5-6 (D. Mass. Jan. 22, 2021) (dismissing breach of contract claim where "the allegations in the complaint as to the existence of a contract concerning the exercise of stock options, and defendant's breach of that contract, [were] wholly inadequate to satisfy [pleading] requirements"). To the extent that Dussault intends to rely upon CMTA's offer letter, see D. 86 at 6-7, 9, which provided that CMTA would "issue 5 shares of CMTA stock to [him] on January 1, 2021" and set the financing terms of same, D. 85-1 at 2, this letter did not contain any terms concerning the company's redemption of such shares, and Dussault does not suggest otherwise. Dussault instead appears to contend that CMTA's breach was in subsequently offering to repurchase the shares and then rescinding this offer. D. 86 at 6 (citing D. 82 ¶¶ 66, 69). Even as alleged, however, CMTA informed Dussault that it would repurchase the shares "if [Dussault] signed a restrictive covenant agreement," D. 82 ¶ 66, and CMTA rescinded an offer to repurchase the shares after Dussault "requested clarification and edits" to a non-solicitation agreement CMTA had offered, id. ¶¶ 68-69. Dussault does not allege that his request constituted an acceptance of CMTA's offer, likely because "[i]t is elementary law that an offer must be accepted in the terms in which it is made in order to become a binding contract." See Wortis v. Dep't of Conservation & Recreation, No. 15-P-236, 2016 WL 787618, at *2 (Mass. App. Ct. Mar. 1, 2016) (quoting Moss v. Old Colony Tr. Co., 246 Mass. 139, 148 (1923)); Uno Rests., 441 Mass. at 388 n.6 (noting that "[u]nder fundamental principles of contract law, a counteroffer operates as a rejection of the original offer"). To the extent that Dussault instead intends to rely upon his

9

allegation that "CMTA acknowledged it unconditionally owed [him] $356,326.78 for approximately 356 Series C vested shares of CMTA's parent company," D. 82 ¶ 111; D. 89 at 3, such argument fares no better, as the amended counterclaim still does not identify "what obligations were imposed on each of the parties by the alleged contract." Hogan v. Teamsters Loc. 170, 495 F. Supp. 3d 52, 58 (D. Mass. 2020) (quoting Alenci v. Hometown Am. Mgmt., LLC, No. 19-cv-12244-LTS, 2020 WL 2515872, at *4 (D. Mass. May 15, 2020)).  Because Dussault fails to plausibly allege that an enforceable contract exists governing redemption of his company shares, he has necessarily failed to state a claim for breach of contract and for breach of the implied covenant of good faith and fair dealing.  See, e.g., Madden, 2021 WL 231298, at *7 (dismissing covenant of good faith and fair dealing claim "for the same reason [as plaintiff's] breach of contract" claim, i.e., plaintiff's failure to "properly allege the existence of a contract").  Also, to the extent such claim is premised on CMTA's offer letter, it fails because Dussault cannot invoke the covenant to create rights not contemplated in the parties' agreement.  See Columbia Plaza, 493 Mass. at 586.  Accordingly, the Court allows CMTA's motion to dismiss as to Counterclaim Counts I and II.

### B.    Defamation (Counterclaim Count IV)

To state a defamation claim under Massachusetts law, a plaintiff must allege plausibly: "(1) that the defendant made a statement, concerning the plaintiff, to a third party; (2) that the statement was defamatory such that it could damage the plaintiff's reputation in the community; (3) that the defendant was at fault in making the statement; and (4) that the statement either caused the plaintiff economic loss or is actionable without proof of economic loss." See Orkin v. Albert, 162 F.4th 1, 13 (1st Cir. 2025) (quoting Shay v. Walters, 702 F.3d 76, 81 (1st Cir. 2012)).  "To properly allege defamation, a plaintiff must specifically identify the allegedly [actionable] statement." Kelleher v. Lowell Gen. Hosp., 98 Mass. App. Ct. 49, 53 n.2 (2020); 3137, LLC v.

10

Town of Harwich, 126 F.4th 1, 15 (1st Cir. 2025).  As to "the second element, in Massachusetts '[t]he question of whether a statement is reasonably susceptible of a defamatory meaning is a threshold question for the court,'" looking at the entire context of the statement from the perspective of a reasonable reader.  Orkin, 162 F.4th at 13 (alteration in original) (quoting Shay, 702 F.3d at 81).  Additionally, as to the third element, "some showing of fault is essential."  Shay, 702 F.3d at 82 (emphasis in original).  An allegedly slanderous statement must be false, Bander v. Metro. Life Ins. Co., 313 Mass. 337, 342 (1943), requiring a plaintiff to show, in a private-plaintiff case like this one, "that the defendant acted negligently," Shay, 702 F.3d at 82.  While this is typically true of a libelous statement, "Massachusetts law . . . recognizes a narrow exception" under which, in some circumstances, "the truth or falsity of the statement is immaterial, and the libel action may proceed, if the plaintiff can show that the defendant acted with 'actual malice' in publishing the statement."  Noonan v. Staples, Inc., 556 F.3d 20, 26 (1st Cir. 2009) (citing Mass. Gen. L. c. 231, § 92).

As clarified by Dussault's opposition, see D. 86 at 11-15, the Court understands the defamation claim to be premised on the following:  (1) that "Benson told Oliver Radford of Harvard that [a] project is currently the subject of litigation and the only way that CMTA would allow [Dussault] to continue to be involved with that project is if Harvard identified CMTA as the project design professional," D. 82 ¶ 137; see D. 86 at 12; (2) that "CMTA's [c]omplaint, and the allegations shared by CMTA with others, are rife with false allegations as to [Dussault] with respect to specific clients and specific projects, including but not limited to:  ([a]) that [Dussault] inappropriately 'competed' with CMTA, ([b]) that the defendants 'conspired' to divert revenue from CMTA to [Dussault], ([c]) that [Dussault] made any misrepresentations to clients regarding CMTA, or ([d]) that DMC paid Dussault for services before Dussault became an employee of

11

DMC," D. 82 ¶¶ 144-45; D. 86 at 13-14; and (3) unspecified statements Farber allegedly made to one or more persons associated with BILH, D. 82 ¶¶ 132-34, 149-50; D. 86 at 13-15.[6]

Although statements contained in a complaint are typically privileged and cannot support a defamation claim, statements to third parties concerning such allegations may be actionable. See Willis v. Willis, No. 06-cv-12310-MLW, 2007 WL 9798261, at *1 (D. Mass. June 14, 2007). Here, however, Dussault fails to state a defamation claim. First, Benson's alleged statement to a Harvard representative that a project was "currently the subject of litigation" cannot support Dussault's claim for at least the reason that Dussault fails to plausibly allege fault.[7] See Shay, 702 F.3d at 82. To the extent Dussault contends that such statement was slander, he has not alleged that it was false. Bander, 313 Mass. at 342; see McAvoy v. Shufrin, 401 Mass. 593, 597 (1988) (explaining that plaintiff must allege falsity, although ultimate burden of showing truth is on defendant); cf. Orkin, 162 F.4th at 14 n.10 (assuming without deciding, in private-plaintiff case, that ultimate burden as to truth is on defendant). If Dussault instead contends that Benson's statement was true but libelous, a true statement is only actionable if made with "actual malice," which in this context "refers to actual malevolent intent or ill will." See Noonan, 556 F.3d at 28; see, e.g., Coughlin v. Town of Arlington, No. 10-cv-10203-MLW, 2011 U.S. Dist. LEXIS 146285, at *7-8, *49-50 (D. Mass. Dec. 19, 2011) (concluding that plaintiffs plausibly alleged actual malice where relevant defendant allegedly acted in concert with defendant superintendent, who

---

[6] Although at the motion hearing, counsel also raised the alleged September 16, 2024 internal announcement about Dussault's termination, see D. 82 ¶¶ 72, 74, the Court accepts Dussault's disclaimer, in his opposition, of any reliance upon such statements, see D. 86 at 14-15 (arguing that CMTA's discussion of such statements "misinterprets and mischaracterizes the substance of Farber's defamatory statements," which were instead that "Farber contacted representatives of BILH-Mount Auburn . . ., among others").

[7] The Court assumes (without deciding) that this statement was "of and concerning" Dussault, see Kelleher, 98 Mass. App. Ct. at 52, and does not reach CMTA's contrary arguments, see D. 85 at 12-13.

"commenced a campaign against" plaintiffs after one plaintiff revealed to school committee that superintendent had lied on resume).[8]  Although Dussault raises "conclusory allegations about 'ill-will' and 'actual malice,'" he has not made factual allegations regarding Benson's conduct that "lend plausibility to these conclusions."  See Shay, 702 F.3d at 82; see, e.g., Dunham v. WBZ-TV, No. 25-cv-12195-MJJ, 2026 WL 1506615, at *6-7 (D. Mass. May 29, 2026) (noting that allegedly defamatory announcement of plaintiff's demotion would not meet actual malice standard where, among other things, announcement was "not tied to any other conduct or speech by [the speaker] himself that [could] lead to an inference of ill will"); Mateo v. Univ. Sys. of N.H., No. 18-cv-11953-FDS, 2019 WL 199890, at *7 (D. Mass. Jan. 14, 2019) (dismissing libel claim where there were "no allegations that the letters defendants sent . . . were false, much less that they were sent with ill will or malevolent intent").

Second, as to the claim that CMTA relayed certain allegedly false allegations in CMTA's complaint to third parties, see D. 82 ¶¶ 144-45, Dussault alleges, upon information and belief, that "CMTA informed certain of DMC's clients of some or all of these false allegations," id. ¶ 145.  Dussault, however, "fail[s] to plead sufficient facts to give [CMTA] notice of the statements at issue."  Bryan v. Ascend Learning, LLC, No. 24-cv-10583-ADB, 2024 WL 5170211, at *9 (D. Mass. Dec. 19, 2024) (reaching same conclusion as to allegations "that on 'multiple occasions,' 'the Company, including Mr. Novorr and Ms. Miller, [] sent emails and/or made phone calls to prospective SPIN customers to advise the schools of the pending Company Lawsuit and to warn them that the Plaintiffs "stole ATI's products"'" (alteration in original)).  The particular factual allegations following this speculative allegation, see D. 82 ¶¶ 146-53, support that someone from

---

[8] This differs from the "actual malice" requirement imposed on public-figure defamation plaintiffs.  See Schatz, 669 F.3d at 52 (explaining that such standard "might suggest ill will or evil motive to the uninitiated but really means knowledge of falsity or reckless disregard for the truth").

CMTA told third parties about this litigation, but they focus on the effect of these conversations (e.g., that Dussault and/or DMC lost business) rather than describing the statements that allegedly led to such outcome, which does not move Dussault's claim across the plausibility threshold. See, e.g., Yaghoobi v. Tufts Med. Ctr., Inc., 762 F. Supp. 3d 85, 96 (D. Mass. 2025) (dismissing defamation claim because "the plaintiff's hunch that statements made to the police or others must have been false and pejorative is too speculative to viably allege that a defendant disclosed . . . false and defamatory information"); cf. Hunt v. Prelude Rsch., Inc., No. 25-cv-10387-JEK, 2025 WL 2785015, at *3 (D. Mass. Sept. 30, 2025) (concluding that former-employee plaintiff stated defamation claim where he alleged that defendant CEO "made disparaging and false statements" to plaintiff's new employer, and former employer sent new employer "a letter alleging that [plaintiff] violated contractual obligations and misappropriated intellectual property," which was knowingly false and allegedly "designed to sabotage [plaintiff's] new job"); see also Crawford v. Salve Regina Univ., 178 F.4th 734, 744 (1st Cir. 2026) (disregarding allegations that plaintiff asserting discrimination claim "was fired because 'students' and 'certain individuals' objected to her teaching" because complaint failed to "identify who made any such statements, what was said, when the statements were made, or whether they were communicated to – or relied upon by – any decisionmaker").[9]

---

[9] To the extent Dussault intended to rely upon his related allegation, made upon information and belief, that "CMTA employees, managers[,] officers and/or directors relayed at least some of the false allegations set forth in the [a]mended [c]omplaint to certain colleagues, clients and contacts of [Dussault] and suggested that they stop working with [Dussault] and [DMC]," see D. 82 ¶¶ 127, 174; his allegation that "CMTA has falsely stated in its [c]omplaint and to [Dussault's] clients and former clients that it had not authorized Dussault to engage in outside work, and Dussault allegedly performed services using CMTA resources but concealed the outside work, including by saving relevant files on external storage media and failing to inform CMTA of the relevant business opportunities," id. ¶ 88; or his allegation that "CMTA's [a]mended [c]omplaint is rife with false statements that were made to various entities," id. ¶ 170, such allegations are similarly lacking in requisite factual detail.

14

Third, Farber's allegedly defamatory statements to BILH cannot save Dussault's defamation claim because, although Dussault "mentions" alleged outreach, he "identifies no objectionable statement" made by Farber. See 3137, LLC, 126 F.4th at 15. Instead, Dussault's factual allegations in this regard focus, again, on the alleged effect of Farber's conversation(s), see D. 82 ¶¶ 130-35, 149-53, and do not state a defamation claim. See, e.g., Johnson v. Allen, No. 22-cv-10907-DJC, 2022 WL 16823008, at *4 (D. Mass. Nov. 8, 2022) (concluding that plaintiffs had alleged, at most, that one defendant "made statements . . . that caused DCF to seek custody of [one plaintiff's] children" but that such allegations were insufficient to state a claim). Accordingly, the Court allows CMTA's motion to dismiss as to Counterclaim Count IV.

## C.    Violations of Chapter 93A (Counterclaim Count III)

Chapter 93A makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 243 (1st Cir. 2005) (alteration in original) (quoting Mass. Gen. L. c. 93A, § 2). Where, as here, a plaintiff brings a claim under § 11, see D. 82 ¶ 164, he must show: "(1) the defendant engaged in an unfair method of competition or committed an unfair deceptive act or practice; (2) a loss of money or property was suffered; and (3) the defendant's unfair or deceptive method, act or practice caused the loss suffered." Anoush Cab, Inc. v. Uber Techs., Inc., 8 F.4th 1, 16 (1st Cir. 2021). Although the amended counterclaim is not entirely clear as to the contours of Dussault's Chapter 93A claim, Dussault clarifies in his opposition that the "wrongful conduct of which CMTA is accused, namely defamation, breach of contract and breach of the implied covenant of good faith and fair dealing, are actionable under" Chapter 93A. D. 86 at 15-17. The Supreme Judicial Court "has clearly articulated the standard that if a Chapter 93A claim is 'derivative of' other claims which fail as a matter of law, the Chapter 93A claim 'must also fail.'" Gattineri v. Wynn MA, LLC, 93 F.4th 505, 511-12 (1st Cir. 2024) (quoting Park Drive

15

Towing, Inc. v. City of Revere, 442 Mass. 80, 85-86 (2004)) (collecting cases).  Accordingly, in light of the Court's conclusions as to Dussault's contract and defamation claims, the Court allows CMTA's motion to dismiss as to Counterclaim Count III.

## VI.    Conclusion

For the foregoing reasons, the Court ALLOWS CMTA's motion to dismiss, D. 84, and dismisses the amended counterclaims without prejudice.[10]

**So Ordered.**

/s Denise J. Casper
Chief United States District Judge

---

[10] At the motion hearing, counsel for Dussault suggested that if the Court allowed the motion to dismiss, Dussault should be given leave to amend.  As the Court noted on February 6, 2026, in addressing a similar request by CMTA, D. 59 at 25 n.11, the "general rule . . . is that a district court need not pay heed to a contingent request for leave to amend made only in opposition papers."  Amyndas Pharms., S.A. v. Zealand Pharma A/S, 48 F.4th 18, 38 n.6 (1st Cir. 2022). Although it is unclear that any proposed amendment would not be futile in light of the Court's ruling today, the Court dismisses the amended counterclaims without prejudice.